David H. Shearer,
Arbitrator. This is an arbitration proceeding between Ervay J. Baker, White & Helm, and the Board of Education of Central School District No. 2 of the Towns of Bath, et al., Steuben County, New York, in which the undersigned was designated and appointed as arbitrator to act under a contract between the parties with the same force and effect as if he had been named arbitrator therein, by order of the Special Term of the Supreme Court made the 14th day of June, 1956. The contract between the parties is an agreement between Owner and Architect made the 12th day of July, 1951 by and between the Board of Education of Central *925 School District No. 2 of Bath, New York, therein called the Owner, and Ervay J. Baker of Hammondsport, New York, and Thomas Lynn White and F. Kirk Helm, doing business as White & Helm of Geneva, New York, therein called the Architect. Section 12 thereof is as follows: “ 12. Arbitration. All questions in dispute under this agreement shall be submitted to arbitration at the choice of either party.”
During the course of the construction, which was the subject matter of said agreement, a dispute arose between Baker, one of the architects, and the Board of Education, as owner. Subsequently, Baker served two demands for arbitration, one in his own name, and one in the joint names of Baker and White & Helm. Litigation with respect to Baker’s right to arbitration ensued with the result that the Court of Appeals in Matter of Baker (Board of Educ.) (309 N. Y. 551) finally determined that Baker was entitled to arbitration. Thereafter the order of the Special Term referred to above was made, appointing the undersigned as arbitrator. In both demands for arbitration Baker alleged claims only against the Board of Education. At the hearings, however, Baker broadened his claims so as to include not only his claim against the Board of Education but also whatever claim he might have against White & Helm. At the outset of the hearings, the Board of Education filed a statement of its claims against the Architect under the agreement referred to above dated July 12, 1951, included both Baker and White & Helm as the Architect and expressly stated its claim against both Baker and White & Helm for any damages it may have sustained. At the commencement of the hearings, White & Helm took the position that any claims between Baker, on the one hand, and White & Helm, on the other, were outside the scope of this arbitration. The arbitrator held that no such limit had been placed on the scope of the arbitration by the order appointing him, that the language of section 12 of the contract was broad enough to include all such claims, and that in the absence of any direction of the court so limiting the scope of the arbitration, the arbitrator would not so limit the proof. Thereafter White & Helm put in proof of the damages they claim to have sustained but stated that they were making no claim against anyone except as an offset against any claim that might be made against White & Helm.
A written stipulation waiving the taking of the oath by the arbitrator was entered into by all the parties. A further written stipulation was made that the fee of the arbitrator be $100 for each day spent in the business of the arbitration, plus *926 expenses, and that the award may require the payment by any party of the arbitrator’s fee and expenses. The hearings were begun on July 24, 1956 and continued intermittently on 22 separate days until December 19, 1956. One hundred sixty-eight exhibits were received in evidence and the transcript of testimony totalled 2,644 pages. The matters involved were thoroughly briefed by attorneys for the parties and in August, 1957 the matter was finally submitted to the arbitrator for his award.
On July 12,1951 the Board of Education entered into an agreement dated that day with Baker and White & Helm for architectural services for such building or buildings and alterations as may be necessary to house a portion of the school and its equipment” and agreed to pay the architects a fee of 6% of the cost of the work. On the same day Baker and White & Helm entered into an agreement between themselves by which they agreed to divide the work so that Baker would do the design, White & Helm the working drawings, and Baker the supervision, each to receive a total of 3%, or one half of the total fee of 6%. Thereafter several schemes for the building of the new junior-senior high school and bus garage and for the remodeling of the existing school were proposed and taken up with the State Education Department. An application for examination and approval of preliminary plans was filed wdth the State Education Department April 24, 1952. On June 5, 1952 the proposition was submitted to the voters of the Haverling Central School District. In the proposed $2,750,000 bond issue were included a new 800-pupil junior-senior high school, a bus garage, and a remodeling of the existing building to house 1,200 pupils, kindergarten through sixth grade. A separate proposition of $185,000 for a swimming pool was included, making the total $2,935,000. The swimming pool proposition was defeated. The remainder were approved. Working drawings were then prepared by White & Helm and the plans and specifications were submitted for bids. John Banner & Associates was the low bidder for the general contract and an agreement dated February 18, 1953 was entered into between John Banner & Associates and the Board of Education for the general contract on the junior-senior high school and bus garage totalling $1,346,000, the bus garage to be completed by September 1, 1953, the high school by September 1, 1954 (Exhibit 4).
The construction seems to have proceeded satisfactorily until August, 1953. Banner was then about two months ahead of schedule. At this point trouble developed between Kinner and *927 Baker, the supervising architect. Much proof was presented at the hearings by all parties to bring to light the facts as they occurred. It is evident that a so-called clash of personalities developed. Baker, relatively limited in his experience in supervision of a construction project of this size, adopted arbitrary methods in dealing with construction defects which he discovered upon inspection. Kinner, the contractor, admitted the defects to others but was quick to take offense at Baker’s methods. Neither sought to conciliate the other with the result that what might have been a harmless spark turned into a conflagration. It must be concluded that both Baker and Kinner were responsible for the trouble which ensued. On August 18, Kinner appeared before the Board of Education and stated Ms grievances against Baker. Baker advised the board that Kinner’s work was defective and continued his efforts to amass proof of the same. The board at first sided with Baker. Kinner took further offense at this. On August 25, Banner served formal notice to arbitrate. On the same day Banner submitted Requisition No. 6 for progress payment in the amount of $81,889.80 for work done from July 27 to August 28. Baker issued stop-work orders on August 27 and on September 8 on the basis that Kinner had given notice of intention to pour a concrete slab in each ease over fill improperly compacted. In the meantime, Baker was assembling his experts to prove Banner was wrong (Goodwin, Metcalf, Hough) and was sending Kinner a multiplicity of letters regarding defects in the work (six letters). Under the contract, if the ArcMteet shall fail to issue any certificate for payment within seven days after it is due, the contractor may, upon seven days’ written notice to the Owner and Architect, stop work or terminate the contract and recover from the Owner payment for all work executed and any loss sustained. By letter dated September 8, Kinner served a seven-day notice of termination of contract because of failure of the board to pay Requisition No. 6. By letter to Kinner dated September 12, Baker stated that as of that date no payment to Kinner could be certified by him. On the same date Baker again sent Kinner a multiplicity of letters covering defects in the work. On September 16, Kinner cut his force on the job from 55 to 10 men. On September 22, Kinner submitted Requisition No. 7 in the amount of $67,770 for payment for work in the period from August 28 to and including September 21. At this time the job was substantially shut down so far as the general contractor, Kinner, was concerned. Thus, the so-called clash of personalities had brought the work to a halt with both Baker *928 and Banner claiming to be right and the Board of Education left in the middle.
On August 28, Mr. White, Mr. Helm and their attorney, Mr. Touhey, went to Bath and met Mr. Grledhill, the board’s attorney, and Mr. Ward, the board’s president, and urged them to contact Kinner to try to adjust the difficulties which had arisen. Grledhill and Ward requested White and Helm to see Kinner. Baker was not present at this meeting. White and Helm saw Kinner that .night. Kinner said he planned to correct the defective work but that he could not work with Baker, that there would have to be some change in the supervision setup. He suggested that either White or Helm could take over the supervision and that he was sure they would get along all right and get the job built. White and Helm reported this to Grledhill and Ward the next morning in Bath. White and Helm said they were willing to do the supervision although it would be a hardship on them but that they were very conscious of their ethical relationship with Baker. Later that day White phoned Grledhill from Geneva and said they thought some third disinterested party should take over the supervision. On August 28, Touhey suggested to Baker that he withdraw from the supervision. Baker refused. On September 2, the board at its meeting passed a resolution expressing confidence in the architects and as a result White & Helm’s attempt to adjust the difficulties with Kinner failed.
At the board meeting held September 8, the question of Kinner’s. Requisition No. 6 for the month of August was considered. Baker presented Metcalf’s summary of estimate of value of the work in place and stated that he could not certify the full amount of Requisition No. 6. White recommended that Kinner be paid at least $50,000. A tentative proposal to certify $50,000 was approved, conditioned on approval of Gledhill and Baker. The next day Kinner’s seven-day notice to terminate the contract was received and nothing was paid on Requisition No. 6.
It will be seen from the above that the difficulties between Baker and Kinner fell into two categories: (1) defective work, and (2) payment of Requisitions No. 6 and No. 7. With respect to the first, Baker informed the board that the defects were substantial. With respect to the second, Baker took the position that because of the defective work and because of the alleged failure of Kinner to submit a proper “ breakdown ” or ‘ ‘ schedule of values ’ ’ of the contract, and because Kinner was at that point submitting the bus garage for final acceptance, he *929 could not certify that Kinner was entitled to be paid Requisition No. 6.
The next attempt by the board to resolve the difficulties took place when it was decided, chiefly at Baker’s suggestion, to bring in Mr. McKaig, an architect and engineer of wide reputation, for the purpose of trying to get the parties together. On September 21, McKaig came to Bath, and conferred with representatives of the board and with Mr. Gilson, architect from the State Education Department. McKaig and Gilson independently inspected the work, came to the conclusion that Kinner had done a reasonably good job, that the defects listed by Baker in his 27 points were minor and could be corrected for no more than $3,000. McKaig and Gilson reported their findings to the board that afternoon. Baker was called into the meeting. Gilson pointed out that Kinner and Baker were never going to be able to work together to complete the job and suggested that Baker turn over supervision to his associate architects so that the job could proceed. Baker refused, stating that the contractor alone was at fault, that he should be sued, and, if necessary, the contract terminated and rebid. The board authorized McKaig to see Kinner to try to get him back on the job.
McKaig saw Kinner on September 23 and was informed by Banner of his troubles with Baker. McKaig discussed possible settlement but Banner took the position that he would never go back on the job if the present architects had anything to do with it. McKaig continued his negotiations with Kinner and reported from time to time to the board. McKaig told the board that in his opinion the failure to pay Requisition No. 6 was a breach of contract and that Kinner could recover $200,000; that they might lose another $150,000 in reletting the contract in addition to the loss of time which would result from any such reletting of contracts. At one meeting White stated that if Baker would not approve the certificates for payment, he, acting as architect of record, would. Negotiations between McKaig and Kinner continued with the result that on October 22 a supplemental agreement was entered into between the board and Kinner whereby Kinner agreed to go back to work, the board paid Kinner Requisitions No. 6 and No. 7 plus interest plus part of the retained percentage, all totalling $215,286, and further agreed to pay Kinner over and above the base contract price what he was entitled to for changes and alterations and for such losses as Kinner may have sustained because of the delays and reactivation of the Avork and additional expense for Avinter construction, the same to be agreed upon by McKaig *930 and Kinner not later than December 1, 1953. At the same meeting on October 22 at which this agreement was approved, the board passed a resolution directing the architects to require Baker to discontinue all further direct connection with the work in the field and the construction work in progress and with any of the contractors. On October 26, White & Helm wired Baker to discontinue all supervision of construction directly or indirectly on the project. From that time on Baker had nothing further to do with the construction. White & Helm, with the assistance of McKaig and with McKaig’s employee, Stevenson, as clerk of the works, took over the supervision. Kinner reactivated the job and completed it practically on schedule by September, 1954. On November 23, 1953 Change Order GrC-10 was negotiated by McKaig adding $18,951 to the contract price covering credits for extra work done or committed to be done prior to the shutdown. By supplemental agreement dated November 11, 1953 between Kinner and McKaig, it was agreed that $110,000 should be paid Kinner for loss sustained by Kinner for delays and reactivation of the work. Subsequently three change orders were negotiated by McKaig covering winter construction costs, the same being GC-17, Februarv 11, 1954 — $4,991.50, GC-22, March 29, 1954 — $4,188.86, and GC-33, December 1, 1954 — $2,607.25. It will thus be seen that in addition to Change Order GC-10, there was paid to Kinner through McKaig’s negotiations a total of $121,787.41 over the contract price.
As stated above, the difficulties between Baker and Kinner centered around (1) defective work, and (2) payment of Requisitions Nos. 6 and 7. It must be concluded that there was some defective work and that Kinner was under an obligation to correct it. But in the main Kinner was doing a reasonably good job and the defects were minor and such as are encountered in the usual construction job of this kind. Baker unfortunately adopted an arbitrary attitude and, instead of employing a diplomatic and conciliatory approach, seemed to do what he could to make the situation more difficult. It is possible, however, that all of this might have been ironed out and adjusted eventually if the matter of the payment of the requisitions had not also arisen. Here Baker was dealing with the heart of the contract. The progress payments were the very lifeblood of the contract without which the contractor could not meet his obligations for payroll, materials and subcontractors. The' utmost care should have been taken not to prejudice him in this respect. In a contract of this kind, the supervising architect acts as the agent of the owner in some matters, but in *931 other matters he acts as the arbiter between the owner and the contractor. When acting in this latter capacity, he must be careful to govern his conduct by judicial standards. This is clearly explained in Architectural and Engineering Law by Bernard Tomson (p. 181): “Not only is it the duty of the architect or engineer to act honestly and in good faith when making his decision, but it is likewise his duty to pass on all matters in dispute properly submitted to him, and to give his estimate, certificate, or approval when the contractor is entitled to it. He cannot withhold a certificate arbitrarily or capriciously. Nor can he refuse his decision or certificate on grounds which it is not within the scope of his authority to determine. Thus, he is not justified in refusing a certificate because the building will cost more than the contract price, or because he thinks the contractor’s claim cannot be sustained. As a general rule, he is permitted to refuse his certificate or approval only where the contractor has substantially failed to perform the contract.”
Elisabeth Sash, Door & Supply Co. v. St. Vincent’s Hosp. (241 App. Div. 751, 752 [2d Dept., 1934]): “On the part of the architect it is essential that he act in a judicial manner, not hastily or capriciously, and that he apply reasonable care and good judgment in making his estimates, that he may not deal unjustly with the subcontractor, who is entitled to a fair payment that he may meet his payrolls, pay for material and go forward with his contract unhampered by lack of funds fairly due him. Any other course would put it within the power of the architect to prevent performance or fulfillment of the contract as a matter of mere whim, caprice or neglect of the duty with which he is charged.”
In The A. I. A. Standard Contract Forms and the Law, by Parker and Adams, the various articles of the standard contract, such as Exhibit 4, are discussed. With respect to article 23, Contractor’s Bight to Stop Work or Terminate Contract, the authors state at page 41: “ Action by the Contractor is apt to be less frequent than action by the Owner. In either case it is a last resort, generally the culmination of trouble over a considerable time. The Architect should be alert to the conditions that might result in such action and make sure that his own actions are not a contributing factor.”
Arid with respect to article 25, Certificates of Payment, at pages 42 to 43:
“ This is one of the most important of the Architect’s functions and should be administered fairly and promptly. As noted under Article 23, failure of the Architect to issue any *932 certificate for payment within seven days after it is due ’ is a justification for the Contractor to stop work or terminate the Contract. The Contractor is to submit his application ten days before the payment is due, which is the date on which the certificate should be issued, thus the Architect is given seventeen days before the Contractor is given a right to act in protest of delay. Most contracts provide for monthly payments, and in most cases contractors pay subcontractors only after receipt of their payments from the Owner. Delay by the Architect can, therefore, create financial hardships all down the line from Contractor to the labor and material men of the subcontractors. * * *
‘ ‘ Similarly, ‘ it is generally held that if a Contractor has attempted in good faith to perform his contract and has substantially performed it, although by inadvertence he has failed to perform it literally according to its terms, he may recover under the contract with a proper deduction to the Owner for the imperfections or omissions in the performance. ’ ”
With this standard in mind, let xis examine the circumstances with respect to Requisitions Nos. 6 and 7. Pursuant to the requirements of the contract Kinner, shortly after the signing of the contract, submitted to Baker a Breakdown of Contract, dated February 26,1953 containing 1.8 items totalling $1,346,000, the contract price. On March 28, he submitted to Baker Requisition No. 1 using this same breakdown. Using the Luther estimate (made before the job was submitted for bids), Baker prepared a revised breakdown (Ex. 38) containing 26 items totalling $1,346,000 with quantities set forth for items 3 through 12 and delivered the same to Voss, Kinner’s assistant, telling him that these figures would be acceptable to Baker. Using the-figures contained in said Exhibit 38, Kinner prepared a new Breakdown of Contract, dated it February 26, 1953, and resubmitted it to Baker who indorsed it with his approval. Kinner then used this breakdown in preparing each of his requisitions from and including No. 1 to and including No. 7. On each of the first five requisitions, Baker issued his certificate of payment, in each of which he certified to the Board of Education that the amount set forth in the contractor’s requisition was due and payable to the contractor for work done during a certain period as set forth in the requisition. Requisition No. 5 brought the total paid to Kinner to $432,479. By letter dated August 24, Kinner submitted to Baker Requisition No. 6 in the amount of $81,889.80 for material and labor for the period July 27 to August 28, using the same breakdown. By this time the trouble between Baker and Kinner had developed. By letter received *933 September 2, Kinner informed Baker that the bus garage was ready for occupancy by the Owner as far as the general construction was concerned with certain stated exceptions and with those exceptions requested acceptance of this building by the Owner before occupancy. By letter dated the same day (Sept. 2), Baker informed Banner of a long list of incomplete and unsatisfactory work in the bus garage and rejected the same as a basis for payment. In the meantime, Baker had taken the position that he could not certify Requisition No. 6 until an independent survey of the value of the work in place had been made, and Baker had retained Metcalf to make this survey. On August 28, Metcalf estimated the total value of the work in place at $502,997. Deducting the retained percentage of 10%, this left a balance of $452,698. The contractor had been paid $432,479, leaving a balance due him of $20,219 without taking into account defective work and credits due the owner. This estimate of Metcalf’s was reported to the board on September 8. On this basis, Baker told the board he could not certify Requisition No. 6. By letter dated September 12, Baker informed Kinner that no payment of the requisition could be certified because the Breakdown of Contract submitted by Kinner had been found to be in error and directed Kinner to submit a proper schedule of values showing all quantities, accompanied by a correct account of cost including certified payroll records, bills of sale, invoices, receipts, vouchers and statements of reasonable overhead and profit. Baker took the further position that Kinner’s request for an acceptance of the bus garage turned Requisition No. 6 into a request for final payment so far as the bus garage was concerned and that for that additional reason Requisition No. 6 could not be certified until Baker was certain the work done by the contractor up to that point entitled him to be paid that additional amount.
The fallacy of all this is apparent. Baker had prepared the breakdown himself and had used it without any recorded objection in certifying the first five requisitions. It was only after trouble had developed between him and Kinner that he took the position that the breakdown was wrong. By doing so, he injected into the picture the problem of computing the value of the work in place — a very difficult task without Kinner’s records as shown by Metcalf’s own admissions. Yet he was willing to take Metcalf’s uncertain estimate as sufficient reason for withholding certification. White’s testimony revealed the true situation. After the job was reactivated, the job was completed by Kinner under the supervision of White & Helm and the same breakdown was used until the end of the contract. *934 Kiimer was entitled to be paid Requisitions Nos. 6 and 7 and would not have been overpaid if Requisitions Nos. 6 and 7 had been paid. White described fully the procedure used in certifying payments and showed that for one familiar with the work in progress it is not difficult to evaluate the amount of work done in the past 30 days. In other words, Baker, having certified the first five requisitions totalling $432,479, should have been able to ascertain without difficulty whether Kinner in the period from July 27 to August 28 had added to that total work and materials amounting to $81,889.80, the amount of Requisition No. 6.
Baker has contended that he could not rely on his own certificates in connection with the first five requisitions because these were only “ payments on account ” and therefore did not constitute an evaluation by him of the work done during the periods covered by said requisitions and certificates. In support of this contention he cites authorities to the effect that progress payments do not constitute acceptance of the work but are only payments on account to the contractor. An examination of these authorities indicates that the application of this ‘ payment on account ’ ’ rule has been made in controversies between the contractor and the owner where the contractor was claiming that intermediate certificates made by the architect were conclusive on the owner with respect to the work done. The courts, in such cases, have held that such intermediate certificates are not conclusive on the owner but constitute payments on account only. In the present case, the language of article 25 of the contract expressly so provides. But this is not to say that as between the owner and the architect there is no duty on the architect in issuing a certificate to make a reasonable evaluation of the work done as covered by the requisition. The owner is relying on the skilled judgment of the architect in making this evaluation and the language of the certificate itself indicates that the architect is representing to the owner that he has made the evaluation and that it is sufficient to warrant payment by the owner. To view the architect’s certificate in any other light would be to make the function of the architect in issuing the certificate an illusion and something of little, if any, value to the owner. Accordingly, when Baker issued the first five certificates, he was representing to the Owner that in his judgment the work covered by the first five requisitions had been done, and when he received Requisition No. 6 he could not justifiedly take the position that the first five certificates meant nothing and were “ payments on account”.
*935 Baker’s other reasons for failing to certify for payment Requisition No. 6 likewise failed. "While there were defects in Banner’s work, they were minor and furnished no basis for refusing to pay any part of his requisition. At the very worst, only minor deductions from the amount of the requisition could have been justified.
The bus garage likewise appears to have been an afterthought. The contract with Kinner was for one lump sum for school and bus garage. In his own breakdown Baker had not separated the items between the school and the bus garage. Requisition No. 6 contains nothing which would indicate that it constituted a request for final payment for the bus garage. Kinner’s letter requesting acceptance of the bus garage related to occupancy only and did not contain a request for final payment for that part of the work. Furthermore, the bus garage was 95% to 98% completed at the time.
It must be concluded, therefore, that in passing on Requisition No. 6, Baker did not maintain a judicial attitude but permitted the troubles which he had experienced with Banner to influence his judgment. The effect of nonpayment of the requisition on Kinner was obvious. The source of funds which he needed to continue the job was cut off and he was forced, as was his right under the contract, to stop work. By this act Baker had put both the contractor and the Owner in exceedingly difficult positions. Mr. McKaig in his later report to the board advised the board that the withholding of payment on Requisition No. 6 was not justified and that it constituted a breach of contract between the board and Kinner.
What followed, including the settlement with Kinner, was the result of this breach. McKaig advised the board that the damages which Kinner might collect, the added cost of rebidding the job, plus the delay in completing the school inevitably occasioned by such rebidding, would be such that every effort should be made to reach a settlement with Kinner and get him back on the job. To do so, it was necessary that someone other than Baker act as supervising architect for the balance of the job. Baker had refused to yield his position and insisted that Kinner alone was at fault, that Kinner’s contract should be terminated and that the job should be rebid. Accordingly, the settlement with Banner had to include the removal of Baker from his position as supervising architect. The amount of the settlement with Kinner must also be viewed in the light of these circumstances. Kinner drove a hard bargain and the board had no other choice but to make the best deal it could.
*936 In determining the award, the arbitrator is guided by principles which seem to him fair and equitable and is not bound by leg’al principles or fixed rules of law.
Fudickar v. Guardian Mut. Life Ins. Co. (62 N. Y. 392, 400 [1875]) holds: “ But it is held, in accordance with what seems to be a just view of the subject, that arbitrators may, unless restricted by the submission, disregard strict rules of law or evidence and decide according to their sense of equity ’ ’.
To require the arbitrator to follow the fixed rules of law in arriving at his award would operate to defeat the object of the proceeding, for then the proper court would still have to pass upon and decide the law and the facts as if no award had been made. (Everett v. Brown, 120 Misc. 349, 351 [1923].)
With these principles in mind, the arbitrator holds that Baker was not wrongfully discharged when he was relieved of his duties as supervising architect by the action of the Board of Education on October 22, 1953. He had been a contributing factor in bringing about the situation which confronted the board when Banner stopped work and walked off the job. The board was justified in taking the steps it did to get Banner back on the job and to finish the construction. If in doing so Baker had to be relieved, it is the opinion of the arbitrator that such action by the board was justifiable. Based on this view of the facts, therefore, Baker is not entitled to damages for wrongful discharge. Accordingly, all Baker’s claims for supervision fees which have not been paid to him are disallowed.
We now come to the counterclaim which the Board of Education has asserted against both Baker and White & Helm.
Insofar as White & Helm are concerned, the arbitrator is of the opinion that they were the innocent third party in this whole transaction. While technically they were parties to the contract between the board and the Architects which called for the entire architectural services, it was known to all' concerned that they were charged only with thé duties of preparing the working drawings and that Baker alone had charge of the supervision. When the difficulties arose between Banner and Baker in August, 1953, White and Helm did everything which could reasonably be expected of them to resolve those difficulties before Banner walked off the job. When, through no fault of theirs, these efforts failed, they still continued to co-operate to bring about a settlement of the situation. When McKaig effected the settlement with Kinner, White & Helm took over the supervision and successfully completed the construction within the time originally specified. All agree that the school district has received a fine school. In view of *937 this record of co-operation and achievement, it would he a violation of equity and good conscience to penalize White & Helm for any technical obligation they may have had under the contract between the board and Baker and White & Helm jointly. Accordingly, the arbitrator holds that the Board of Education is not entitled to any damages against White & Helm.
With respect to the counterclaim of the board against Baker individually, the arbitrator reaches the same conclusion but for a different reason. It is true that Baker was at least partly to blame for the trouble with Kinner and that he was largely responsible for the failure of the board to pay Requisition No. 6 which caused Kinner to walk off the job and laid the basis for Kinner’s claim for the damages which were paid by the board to Kinner in the settlement brought about by McKaig. Baker, however, was not solely to blame for this situation. Kinner, too, bore a great responsibility for what happened. The settlement with Kinner was dictated more by expediency than by what may have been strictly due Kinner. In other words, the board was buying its peace, and Kinner, because of the cost of the other alternatives facing the board, had much the more advantageous bargaining position. Accordingly, it would not be fair to place the burden of paying the cost of such a settlement on .Baker. Baker’s work on the preliminary plans was excellent. Everyone admits he designed a fine school. His difficulties on the supervision phase of the work were not intentional. With a contractor other than Kinner, Baker might have had no serious difficulties at all. It was his misfortune to have met up with someone with whom he had difficulty in getting along and not to recognize that fact in time to forestall the development of the situation which occurred. Baker has already lost much from his involvement in this dispute. In good conscience, he ought not to be required to pay damages to the board. The arbitrator so holds.
Likewise, Baker is not entitled to any damages from his associate architects, White & Helm. . They did not seek to take over the job of the supervising architect but did so only to assist the board in resolving the situation and to get the school completed. Just as it was justifiable for the board to relieve Baker from the duties of supervising architect, so it was justifiable for White & Helm to take over such duties. In fact, it would seem that their obligations under their contract with the board required them to see to it that the complete architectural job was done. The arbitrator concludes, *938 therefore, that "White & Helm are not liable to Baker in any respect.
Baker’s claims against the Board of Education, include not only his claim for damages for alleged wrongful discharge, but also claims for compensation or reimbursement covering several other items. One of these is a claim for disbursements in hiring Metcalf, St. John, Pilotti and Judge Pratt, together with so-called extra expense for Baker’s two office employees and Baker himself. The arbitrator holds that these expenses were incurred by Baker in furtherance of his own purpose of building up his case against Kinner and that they contributed little, if anything, to the job of getting the school built for which the board should be responsible. This claim, therefore, is not allowed.
Another of Baker’s claims is for Baker’s work in preparing the preliminary plans of the so-called 5-6 grade wing on the junior-senior high school. It does not appear that the State Department of Education ever approved of this proposal, or that it was ever submitted to the voters for their approval. In fact, the brochure by which the project was submitted to the voters expressly states as one of the items in the proposed project: ‘ Remodeling and equipping present building to adequately house 1200 elementary grade pupils, kindergarten through sixth grade.” This statement negates the contention that there ever was a decision to add a 5-6 grade wing to the new junior-senior high "school. And it is a fact that said 5-6 grade wing was never built. Accordingly, the arbitrator finds that this proposal never got beyond the stage where schemes or sketches were prepared and that Baker is not entitled to any compensation with respect to the same.
Baker also claims fees for the remodeling of the existing school building which formerly housed grades from K through 12. It appears from the record that the extent of this proposed remodeling varied back and forth during the preliminary period. In chronological order, there is the report of the State Education Department dated October 8, 1941 in which the department advised that in order to provide an adequate modern K-6 program all the existing schools should be studied. The report contains language which would indicate that at that time the State Education Department favored confining the remodeling of the existing school to a K-4 project with a 5-6 grade wing on the new junior-senior high school. A later letter from the State Education Department dated January 23, 1952, however, states that there was unanimous agreement that no *939 grade-school classrooms should be added to the existing building and that no grade-school rooms would be immediately provided in the new high school building. Next, we have the brochure issued to the voters for the vote on June 5, 1952 which states as part of the proposal: “ Remodeling and equipping present building to adequately house 1,200 elementary grade pupils, Kindergarten through sixth grade ”. Then there are the eight bills for architectural services submitted by Baker and White & Helm commencing July 7, 1952 and continuing through September 14, 1953, which were paid by the Board of Education. In each of these bills there is an item for preliminary plans (1 %%) on “ Grade School Alteration ”. In Bills Nos. 1 through 3, these grade school alterations are listed at a figure of $125,000. In Bill No. 4, dated February 20, 1953, however, the item is listed “ Grade School Alterations — Estimate of April 24, 1952 — $165,000.00 ”, and this same amount is continued throughout the remainder of said bills. It would thus appear that Baker has been paid his fee of 1%% for preliminary plans on the grade school alterations. The fact is that in June, 1954, after Baker was no longer connected with the project, White & Helm had to redesign the remodeling of the existing building so as to include a new cafeteria wing. This new design made by White & Helm was approved by the State Education Department. The cost of the remodeling thus provided for was $159,000 for which the fee for preliminary plans at 1%% would have been $2,387. White & Helm were never paid for this and have included this amount in their list of damages which White & Helm submitted for offset purposes only. Hence it appears that Baker was paid for these plans and his claim for additional compensation with respect to this project is disallowed.
Baker’s claims for fees in the remodeling of the old wooden frame homemaking house at a cost of $12,000 is likewise disallowed. This was an entirely separate project for which a separate bond issue was voted and was never a part of the original contract between the board and Baker and White & Helm.
There is one claim of Baker’s which falls in a different category. Baker completed preliminary plans for the swimming pool and these plans were submitted to and approved by the State Education Department. The cost was estimated at $183,600. In the brochure submitting the matter to a vote of the school district, a separate proposition for the swimming pool in the amount of $185,000 was submitted and was defeated. Under article 13 of the contract between the board and Baker *940 and White & Helm it was agreed that such preliminary plans should be completed prior to submission to the voters to such an extent that the proposition might be submitted, and that thereupon the board would pay the architects 85% of the fee due for preliminary studies. The record indicates that Baker has never been paid for these services. Accordingly, Baker is entitled to 85% of 1%% of $185,000, or $2,358.75 with interest from October 23, 1953, the date when Baker was relieved as supervising architect by the board.
All other claims of Baker are disallowed.
Therefore, David H. Shearer, arbitrator to whom was submitted the matters in controversy between the parties above named, having heard and read the testimony of the witnesses and the documentary evidence provided by the parties to said arbitration, together with the arguments of counsel thereon, and having considered their briefs, and after due deliberation upon the evidence produced and the arguments and briefs of counsel, does hereby make the following determination and decision and does hereby render the following award:
1. Damages in the amount of $2,358.75 with interest from October 23, 1953 are awarded to be paid by the Board of Education of Central School District No. 2 to Ervay J. Baker, individually, and Ervay J. Baker, individually, may have judgment therefor against the Board of Education of Central School District No. 2, to be entered in the Supreme Court of Steuben County.
2. All other claims of Ervay J. Baker against the Board of Education of Central School District No. 2 are hereby disallowed.
3. All claims of the Board of Education of Central School District No. 2 against Ervay J. Baker, individually, or against White & Helm, individually, or against Ervay J. Baker and White & Helm, jointly, are hereby disallowed.
4. All claims of Ervay J. Baker, individually, against White & Helm are hereby disallowed.
5. The arbitrator finds that the proper fee and compensation to the arbitrator pursuant to the written stipulation entered into by all parties is a total of $3,000, consisting of 30 days at $100 per day, and the arbitrator awards that said total of $3,000 shall be a charge against Ervay J. Baker, White & Helm, and the Board of Education of Central School District No. 2, jointly and severally, and further that as between themselves each of said parties shall pay one third thereof,